THE STATE OF KANSAS v. LOUIS A. ROSE.

1. THE WORD "STEALING"—*Not Error to Strike Out.* The defendant was prosecuted, convicted, and sentenced for murder in the first degree. The defendant and the deceased resided and the offense was committed in Ellsworth county, Kansas. The defendant admitted the killing, but claimed it was done in self-defense. The defendant introduced two certain depositions in evidence on the trial. These depositions stated, among other things, that while the deceased resided in Hanover township, Ashland county, Ohio, "His occupation was burning charcoal, getting out ties, and stealing," and "his occupation was farming, stealing, and driving team." The trial court struck out the word "stealing" from these depositions. *Held,* Not error.

2. MURDER; *Instruction, Not Erroneous.* The court gave the following instruction, among others, to the jury: " 27. I have given you already the definition of justifiable homicide. That portion of the definition applicable here is as follows: 'Homicide shall be justifiable when committed by any person . . . in the lawful defense of of such person . . . when there shall be a reasonable cause to apprehend a design to commit a felony, or to do some great personal injury, and there shall be immediate danger of such design being accomplished.' By this definition we see, that before a person can take the life of another, it must reasonably appear that his own life must have been in imminent danger, or that he was in imminent danger of some great bodily injury from the hands of the person killed. No one can attack and kill another because he may fear injury at some future time." *Held,* That, in the light of the evidence and the other instructions to the jury, this instruction was not misleading or erroneous.

3. ——— Other instructions referred to and held not to be erroneous.

*Appeal from Ellsworth District Court.*

INFORMATION for murder in the first degree, charging *Louis A. Rose* with the felonious killing of Andrew Ware, in Ellsworth county, on the 18th day of September, 1881. Trial at the February Term, 1882, of the district court, when the defendant was found guilty as charged, and sentenced accordingly. He appeals. The opinion states the facts.

*Lloyd & Evans,* for appellant.

*W. A. Johnston,* attorney general, *L. H. Seaver,* county attorney, and *Edwin A. Austin,* for The State.

The opinion of the court was delivered by

VALENTINE, J.: This was a criminal prosecution for murder in the first degree. The defendant was charged with that offense, and was found guilty, and sentenced; and he now appeals to this court. The name of the defendant is Louis A. Rose, and the name of the man alleged to have been murdered, the deceased, was Andrew Ware.

In this court the defendant claims that the court below erred in striking out the word "stealing" from the depositions of Stephen Coe and Dr. S. S. Mills, and in giving to the jury certain instructions, numbered 27, 29, 30, 31, and 32.

The defendant and the deceased lived on adjoining farms, in Ellsworth county, Kansas, and the alleged murder was committed in that county. Both of these depositions were introduced in evidence by the defendant. Stephen Coe, in his deposition, testified, among other things, that while the deceased resided in Hanover township, Ashland county, Ohio, "his occupation was burning charcoal, getting out ties, and stealing;" and Dr. S. S. Mills, in his deposition, testified among other things, that while the deceased resided in Hanover township, Ashland county, Ohio, "his occupation was farming, stealing, and driving team." There was no testimony with reference to Ware's general character upon the subject of stealing, no evidence with respect to particular acts of theft or larceny, and no evidence that either Coe or Mills knew what Ware's general character or reputation with respect to stealing or larceny was, or that either of them knew of any particular act on the part of Ware with respect to stealing or larceny; and the question as to whether Ware was a thief, or not, was not a question in the case. We think the word "stealing" was properly stricken out by the court. It did not tend to prove any issue in the case, and was otherwise incompetent.

The instructions of the court below, from No. 27 to No. 32, read as follows :

"27. I have given you already the definition of justifiable

homicide.  That portion of the definition applicable here is as follows:  'Homicide shall be justifiable when committed by any person . . . in the lawful defense of such person, . . . when there shall be a reasonable cause to apprehend a design to commit a felony, or to do some great personal injury, and there shall be immediate danger of such design being accomplished.'  By this definition we see, that before a person can take the life of another, it must reasonably appear that his own life must have been in imminent danger, or that he was in imminent danger of some great bodily injury from the hands of the person killed.  No one can attack and kill another because he may fear injury at some future time.

"28.  Our supreme court has said upon this precise point, 'that the accused must have believed that he was in immediate and actual danger of his life or great bodily injury from the deceased, and his belief must rest upon reasonable grounds, and the party from whom the danger is apprehended must be making some attempt to execute his design, or at least be in an apparent situation to do so, and thereby induce a reasonable belief that he intends to do so immediately.'  As to whether this condition of things existed in this case, at the time the fatal shot was fired, is a question for the jury to determine under all the circumstances.  You should judge of the act of the defendant under all the circumstances in which he was placed.

"29.  One, when first attacked, is not obliged to flee, but he may stand and defend himself, using such force as may be reasonably necessary for that purpose, and in accordance with the rules of self-defense just given.  One, however, should not deliberately commence an unlawful attack upon another with a deadly weapon.  If he should do so, and purposely and unnecessarily then kill such other, the crime would be murder.

"30.  It may not be improper for me to here mention, that the theory or claim of the state is substantially that the defendant, being at enmity with the deceased, armed himself, formed the intent to kill the deceased, and coming across him in his own corn-field, unoffending and unarmed, shot him down in cold blood.  If you should believe this to be so, the crime would be murder in the first degree.  The defendant denies this, but claims the deceased came to defendant's premises in the night; shot at him as he came out of the

door of his house; that he then armed himself, and being afraid to stay in the house for fear of fire, he came outside and then and there the shooting took place in the manner he has related to you. It is solely for you to determine which of these claims, if either, is true.

"31. The rules of self-defense do not apply at all if the claim of the state is true. If you shall believe the claim and theory of the defense, however, to be true on the facts, you will then apply the rules of law I have given on self-defense, and then determine if you shall believe that the killing was under them justifiable. If you shall determine that it was not justifiable, you then would find him guilty of such offense as you deem the facts and the law demand.

".32. The defense has introduced evidence tending to show that the deceased, Andrew Ware, was a quarrelsome, passionate, violent and dangerous man, and also had made threats of violence against the defendant. Now it is no excuse to kill such a man, or to kill him merely for having made threats. This evidence is not offered for that purpose; but it is offered and is competent, if proven, as bearing upon two points in the case: first, upon the question as to whether probably the deceased might have come to and was present at the defendant's house, and first attacked the defendant, as he claims, on the night in question; and, second, upon the question as to whether, if Ware did first attack the defendant, the defendant was in imminent danger, and that the defendant then knowing these things, might so reasonably suppose, and therefore be further excused in going the length he did on that occasion. You should also consider, of course, the testimony of the state upon this question of the character of the deceased."

The defendant urges strenuously in this court that the court below erred in giving the instruction numbered 27. It is only the last two sentences of this instruction, however, of which the defendant complains. Now, with respect to the first of said sentences, we would say that in the light of the facts of the case and of the other instructions, including especially instruction No. 28, we would think that no error was committed in giving this sentence. We would construe the sentence to mean as follows: "By this definition we see that before a person can take the life of another, it must rea-

sonably appear [*to him*] that his own life [*is*] in imminent danger, or that he [*is*] in imminent danger of some great bodily injury from the hands of the person killed." We have inserted the words in brackets — the first, as an addition; the second in the place of the words "must have been;" and the third in the place of the word "was." We cannot believe that the jury were misled by this sentence; but, in the light of the evidence and the other instructions, we certainly think they must have understood it; and if they understood it as we do, the instruction was right, and was a proper instruction for the case. We might here say that the defendant admitted on the trial that he killed the deceased; and really the only matter in dispute was whether the defendant killed the deceased in self-defense or not. We think no material error was committed in giving this portion of the instruction.

The defendant also complains of the last sentence of this instruction. He claims that the use of the words "future time," as used in the last sentence in this instruction, was misleading and erroneous. He, in substance, claims that *present time* can include only an infinitesimally small portion of time — a mere point of time, inconceivably short, and actually present and existing; and that all the time coming after this inconceivably short portion of present time must, of necessity, be "future time." He claims that every moment of time not already past or actually existing must, of necessity, be "future time;" and hence he claims that such an instruction as the foregoing virtually annuls and destroys all pleas of self-defense. He says, that under this instruction, Rose would be guilty of murder, even if he had believed when he shot and killed Ware that if he had not done so at that very time he would himself have been instantly shot and killed by Ware. He claims that all time that has not actually transpired, or is not actually transpiring, is "future time;" and to fear that death will be inflicted instantly or immediately is in fact to "fear injury at some future time." Now the fact is, people seldom, if ever, use the words "future time" in the sense in which the defendant

desires to use them. The court did not use them in that sense; nor could the jury have believed that the court intended to so use them. "Present time" usually means a period of time of some appreciable duration, and generally of some considerable duration. It may mean a day, a year, or a century. We often speak of the *present* century and of *future* centuries. "Present time" usually means some period of time within which certain transactions are to take place; and "future time" usually means a period of time to come after such present time, and after the period of time when such transactions have actually taken place. The time that the court had in contemplation as *present time* when it gave this instruction was evidently the time during which the defendant and Ware were engaged in their final conflict which resulted in the death of Ware; and the time which the court had in contemplation as "future time" was evidently some period of time which would necessarily and in the natural order of things take place subsequently and at some indefinite period of time after that conflict had finally ended. It certainly was not intended to include as "future time" the time in which the defendant was engaged in his last difficulty with Ware. The court did not say "immediately," but said "at some future time."

We might here say, that prior to the death of Ware, the defendant and Ware had had several difficulties and quarrels, and each had made threats of violence against the other. Finally, and on the night of the 18th of September, 1881, Ware and his son Benjamin, a boy about fourteen years of age, were killed, and they were buried on the defendant's premises, in his potato-patch. No one was present when Ware and his son were killed, or buried, except the defendant and his wife, and therefore no one except them has any actual knowledge concerning these matters. No one except the defendant and his wife knew where Ware and his son were killed. The defendant says, and so testified on the trial, that the killing was done at or near his own premises, and in self-defense, and that he killed Ware by shooting him, and that his wife killed the

boy by a blow on the head. About a week after the death of Ware and his son, the defendant absconded; and about three weeks thereafter, the bodies of Ware and his son were found by the neighbors and the sheriff of the county in the potato-patch, where the defendant and his wife had buried them. Afterward the defendant was arrested in the southern part of the state, and was brought to trial for the murder of Ware, with the result already stated.

Under the facts and circumstances of this case, and in the light of other instructions, we do not think that the foregoing instruction was misleading or erroneous.

We have not pretended to state the numerous details of the evidence.

With reference to instructions numbered 29, 30, 31, and 32, we do not think that it is necessary to enter into any discussion, or to make any comment. We see nothing in them that requires, or even authorizes, a reversal of the judgment of the court below.

Perceiving no material error in this case, the judgment of the court below will be affirmed.

All the Justices concurring.