No. 60,896

STATE OF KANSAS, *Appellant*, v. PEGGY STEWART, *Appellee*.

(763 P.2d 572)

Opinion filed October 21, 1988.

*Michael E. Ward*, deputy county attorney, argued the cause, and *Morgan Metcalf*, county attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellant.

*Jessica R. Kunen*, deputy appellate defender, argued the cause and was on the brief for appellee.

*James W. Clark*, Executive Director, Kansas County and District Attorney Association, of Topeka, and *Geary N. Gorup*, of Moore & Rapp, P.A., of Wichita,

were on the *amicus curiae* brief for the Kansas County and District Attorney Association.

The opinion of the court was delivered by

LOCKETT, J.: A direct appeal by the prosecution upon a question reserved (K.S.A. 1987 Supp. 22-3602[b][3]) asks whether the statutory justification for the use of deadly force in self-defense provided by K.S.A. 21-3211 excuses a homicide committed by a battered wife where there is no evidence of a deadly threat or imminent danger contemporaneous with the killing. An *amicus curiae* brief has been filed by the Kansas County and District Attorney Association.

Peggy Stewart fatally shot her husband, Mike Stewart, while he was sleeping. She was charged with murder in the first degree, K.S.A. 21-3401. Defendant pled not guilty, contending that she shot her husband in self-defense. Expert evidence showed that Peggy Stewart suffered from the battered woman syndrome. Based upon the battered woman syndrome, the trial judge instructed the jury on self-defense. The jury found Peggy Stewart not guilty.

The State stipulates that Stewart "suffered considerable abuse at the hands of her husband," but contends that the trial court erred in giving a self-defense instruction since Peggy Stewart was in no imminent danger when she shot her sleeping husband. We agree that under the facts of this case the giving of the self-defense instruction was erroneous. We further hold that the trial judge's self-defense instruction improperly allowed the jury to determine the reasonableness of defendant's belief that she was in imminent danger from her individual subjective viewpoint rather than the viewpoint of a reasonable person in her circumstances.

Following an annulment from her first husband and two subsequent divorces in which she was the petitioner, Peggy Stewart married Mike Stewart in 1974. Evidence at trial disclosed a long history of abuse by Mike against Peggy and her two daughters from one of her prior marriages. Laura, one of Peggy's daughters, testified that early in the marriage Mike hit and kicked Peggy, and that after the first year of the marriage Peggy exhibited signs of severe psychological problems. Subsequently, Peggy was hospitalized and diagnosed as having symptoms of paranoid schizophrenia; she responded to treatment and was soon re-

leased. It appeared to Laura, however, that Mike was encouraging Peggy to take more than her prescribed dosage of medication.

In 1977, two social workers informed Peggy that they had received reports that Mike was taking indecent liberties with her daughters. Because the social workers did not want Mike to be left alone with the girls, Peggy quit her job. In 1978, Mike began to taunt Peggy by stating that Carla, her 12-year-old daughter, was "more of a wife" to him than Peggy.

Later, Carla was placed in a detention center, and Mike forbade Peggy and Laura to visit her. When Mike finally allowed Carla to return home in the middle of summer, he forced her to sleep in an un-air conditioned room with the windows nailed shut, to wear a heavy flannel nightgown, and to cover herself with heavy blankets. Mike would then wake Carla at 5:30 a.m. and force her to do all the housework. Peggy and Laura were not allowed to help Carla or speak to her.

When Peggy confronted Mike and demanded that the situation cease, Mike responded by holding a shotgun to Peggy's head and threatening to kill her. Mike once kicked Peggy so violently in the chest and ribs that she required hospitalization. Finally, when Mike ordered Peggy to kill and bury Carla, she filed for divorce. Peggy's attorney in the divorce action testified in the murder trial that Peggy was afraid for both her and her children's lives.

One night, in a fit of anger, Mike threw Carla out of the house. Carla, who was not yet in her teens, was forced out of the home with no money, no coat, and no place to go. When the family heard that Carla was in Colorado, Mike refused to allow Peggy to contact or even talk about Carla.

Mike's intimidation of Peggy continued to escalate. One morning, Laura found her mother hiding on the school bus, terrified and begging the driver to take her to a neighbor's home. That Christmas, Mike threw the turkey dinner to the floor, chased Peggy outside, grabbed her by the hair, rubbed her face in the dirt, and then kicked and beat her.

After Laura moved away, Peggy's life became even more isolated. Once, when Peggy was working at a cafe, Mike came in and ran all the customers off with a gun because he wanted Peggy to go home and have sex with him right that minute. He

abused both drugs and alcohol, and amused himself by terrifying Peggy, once waking her from a sound sleep by beating her with a baseball bat. He shot one of Peggy's pet cats, and then held the gun against her head and threatened to pull the trigger. Peggy told friends that Mike would hold a shotgun to her head and threaten to blow it off, and indicated that one day he would probably do it.

In May 1986, Peggy left Mike and ran away to Laura's home in Oklahoma. It was the first time Peggy had left Mike without telling him. Because Peggy was suicidal, Laura had her admitted to a hospital. There, she was diagnosed as having toxic psychosis as a result of an overdose of her medication. On May 30, 1986, Mike called to say he was coming to get her. Peggy agreed to return to Kansas. Peggy told a nurse she felt like she wanted to shoot her husband. At trial, she testified that she decided to return with Mike because she was not able to get the medical help she needed in Oklahoma.

When Mike arrived at the hospital, he told the staff that he "needed his housekeeper." The hospital released Peggy to Mike's care, and he immediately drove her back to Kansas. Mike told Peggy that all her problems were in her head and he would be the one to tell her what was good for her, not the doctors. Peggy testified that Mike threatened to kill her if she ever ran away again. As soon as they arrived at the house, Mike forced Peggy into the house and forced her to have oral sex several times.

The next morning, Peggy discovered a loaded .357 magnum. She testified she was afraid of the gun. She hid the gun under the mattress of the bed in a spare room. Later that morning, as she cleaned house, Mike kept making remarks that she should not bother because she would not be there long, or that she should not bother with her things because she could not take them with her. She testified she was afraid Mike was going to kill her.

Mike's parents visited Mike and Peggy that afternoon. Mike's father testified that Peggy and Mike were affectionate with each other during the visit. Later, after Mike's parents had left, Mike forced Peggy to perform oral sex. After watching television, Mike and Peggy went to bed at 8:00 p.m. As Mike slept, Peggy thought about suicide and heard voices in her head repeating over and over, "kill or be killed." At this time, there were two vehicles in

the driveway and Peggy had access to the car keys. About 10:00 p.m., Peggy went to the spare bedroom and removed the gun from under the mattress, walked back to the bedroom, and killed her husband while he slept. She then ran to the home of a neighbor, who called the police.

When the police questioned Peggy regarding the events leading up to the shooting, Peggy stated that things had not gone quite right that day, and that when she got the chance she hid the gun under the mattress. She stated that she shot Mike to "get this over with, this misery and this torment." When asked why she got the gun out, Peggy stated to the police:

"I'm not sure exactly what . . . led up to it . . . and my head started playing games with me and I got to thinking about things and I said I didn't want to be by myself again. . . . I got the gun out because there had been remarks made about me being out there alone. It was as if Mike was going to do something again like had been done before. He had gotten me down here from McPherson one time and he went and told them that I had done something and he had me put out of the house and was taking everything I had. And it was like he was going to pull the same thing over again."

Two expert witnesses testified during the trial. The expert for the defense, psychologist Marilyn Hutchinson, diagnosed Peggy as suffering from "battered woman syndrome," or post-traumatic stress syndrome. Dr. Hutchinson testified that Mike was preparing to escalate the violence in retaliation for Peggy's running away. She testified that loaded guns, veiled threats, and increased sexual demands are indicators of the escalation of the cycle. Dr. Hutchinson believed Peggy had a repressed knowledge that she was in a "really grave lethal situation."

The State's expert, psychiatrist Herbert Modlin, neither subscribed to a belief in the battered woman syndrome nor to a theory of learned helplessness as an explanation for why women do not leave an abusive relationship. Dr. Modlin testified that abuse such as repeated forced oral sex would not be trauma sufficient to trigger a post-traumatic stress disorder. He also believed Peggy was erroneously diagnosed as suffering from toxic psychosis. He stated that Peggy was unable to escape the abuse because she suffered from schizophrenia, rather than the battered woman syndrome.

At defense counsel's request, the trial judge gave an instruction on self-defense to the jury. The jury found Peggy not guilty.

The first issue is whether we have jurisdiction to hear this appeal. K.S.A. 1987 Supp. 22-3602(b) provides:

"Appeals to the supreme court may be taken by the prosecution from cases before a district judge as a matter of right in the following cases, and no others:
"(1) From an order dismissing a complaint, information or indictment;
"(2) from an order arresting judgment;
"(3) upon a question reserved by the prosecution; or
"(4) upon an order granting a new trial in any case involving a class A or B felony."

Although the State may not appeal an acquittal, it may reserve questions for appeal. *State v. Martin,* 232 Kan. 778, 779, 658 P.2d 1024 (1983). We will not entertain an appeal by the prosecution merely to determine whether the trial court committed error. *State v. Lamkin,* 229 Kan. 104, Syl. ¶ 2, 621 P.2d 995 (1981). The appeal by the prosecution must raise a question of statewide interest, the answer to which is essential to the just administration of criminal law. *State v. Martin,* 232 Kan. at 780.

The question reserved is whether the trial judge erred in instructing on self-defense when there was no imminent threat to the defendant and no evidence of any argument or altercation between the defendant and the victim contemporaneous with the killing. We find this question and the related question of the extent to which evidence of the battered woman syndrome will be allowed to expand the statutory justification for the use of deadly force in self-defense are questions of statewide importance.

The State claims that under the facts the instruction should not have been given because there was no lethal threat to defendant contemporaneous with the killing. The State points out that Peggy's annulment and divorces from former husbands, and her filing for divorce after leaving Mike, proved that Peggy knew there were non-lethal methods by which she could extricate herself from the abusive relationship.

Under the common law, the excuse for killing in self-defense is founded upon necessity, be it real or apparent. 40 Am. Jur. 2d, Homicide § 151, p. 439. Early Kansas cases held that killing in self-defense was justifiable when the defendant had reasonable grounds to believe that an aggressor (1) had a design to take the defendant's life, (2) attempted to execute the design or was in an apparent situation to do so, and (3) induced in the defendant a reasonable belief that he intended to do so immediately. *State v. Horne,* 9 Kan. *119, *129 (1872), *overruled on other grounds* 15 Kan. 547, 554 (1875).

In *State v. Rose*, 30 Kan. 501, 1 Pac. 817 (1883), we approved an instruction on self-defense which stated in part: "[B]efore a person can take the life of another, it must reasonably appear that his own life must have been in imminent danger, or that he was in imminent danger of some great bodily injury from the hands of the person killed. No one can attack and kill another because he may fear injury at some future time." 30 Kan. at 503. The perceived imminent danger had to occur in the present time, specifically during the time in which the defendant and the deceased were engaged in their final conflict. 30 Kan. at 506.

These common-law principles were codified in K.S.A. 21-3211, which provides:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

The traditional concept of self-defense has posited one-time conflicts between persons of somewhat equal size and strength. When the defendant claiming self-defense is a victim of long-term domestic violence, such as a battered spouse, such traditional concepts may not apply. Because of the prior history of abuse, and the difference in strength and size between the abused and the abuser, the accused in such cases may choose to defend during a momentary lull in the abuse, rather than during a conflict. See Comment, *Criminal Law: The Kansas Approach to the Battered Woman's Use of Self-Defense [State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985)], 25 Washburn L. J. 174 (1985). However, in order to warrant the giving of a self-defense instruction, the facts of the case must still show that the spouse was in imminent danger close to the time of the killing.

A person is justified in using force against an aggressor when it appears to that person and he or she reasonably believes such force to be necessary. A reasonable belief implies both an honest belief and the existence of facts which would persuade a reasonable person to that belief. K.S.A. 21-3211; *State v. Childers,* 222 Kan. 32, 48, 563 P.2d 999 (1977). A self-defense instruction must be given if there is any evidence to support a claim of self-defense, even if that evidence consists solely of the defendant's testimony. *State v. Hill,* 242 Kan. 68, 78, 744 P.2d 1228 (1987).

Where self-defense is asserted, evidence of the deceased's long-term cruelty and violence towards the defendant is admissible. *State v. Hundley*, 236 Kan. 461, 464, 693 P.2d 475 (1985); *State v. Gray*, 179 Kan. 133, 292 P.2d 698 (1956). In cases involving battered spouses, expert evidence of the battered woman syndrome is relevant to a determination of the reasonableness of the defendant's perception of danger. *State v. Hodges*, 239 Kan. 63, 716 P.2d 563 (1986). Other courts which have allowed such evidence to be introduced include those in Florida, Georgia, Illinois, Maine, New Jersey, New York, Pennsylvania, Washington, and Wisconsin. See Johann & Osanka, "I Didn't Mean to Kill Him!," 14 Barrister 19, 20 (Fall 1987). However, no jurisdictions have held that the existence of the battered woman syndrome in and of itself operates as a defense to murder.

In order to instruct a jury on self-defense, there must be some showing of an imminent threat or a confrontational circumstance involving an overt act by an aggressor. There is no exception to this requirement where the defendant has suffered long-term domestic abuse and the victim is the abuser. In such cases, the issue is not whether the defendant believes homicide is the solution to past or future problems with the batterer, but rather whether circumstances surrounding the killing were sufficient to create a reasonable belief in the defendant that the use of deadly force was necessary.

In three recent Kansas cases where battered women shot their husbands, the women were clearly threatened in the moments prior to the shootings. *State v. Hundley*, 236 Kan. 461, involved a severely abused wife, Betty Hundley, who shot her husband, Carl, when he threatened her and reached for a beer bottle. Several weeks prior to the shooting, Betty had moved to a motel. Carl continued to harass her and threaten her life. On the day of the shooting, Carl threatened to kill her. That night he forcibly broke into Betty's motel room, beat and choked her, painfully shaved her pubic hair, and forced her to have intercourse with him. Thereafter, he pounded a beer bottle on the night stand and demanded that Betty get him some cigarettes. Betty testified that he had attacked her with beer bottles before. She pulled a gun from her purse and demanded that Carl leave. When Carl saw

the gun he stated: "You are dead, bitch, now." Betty fired the gun and killed Carl.

In *State v. Osbey,* 238 Kan. 280, 710 P.2d 676 (1985), Osbey was convicted of first-degree murder of her husband. On the day of the shooting, the husband had a gun and had communicated threats to kill Osbey both to her and others. He had shown the gun to a friend of Osbey's who warned Osbey. After an argument, when the husband was moving out, Osbey threw his chair towards his van. Osbey's husband said, "I'm sick of this shit," picked up some record albums from inside the van, and started towards the house. Osbey ran inside, loaded a gun, and told her husband to stay back because she did not want to hurt him. Her husband said he did not want to hurt her, either, and reached behind the albums he was carrying. Fearing he was reaching for his gun, Osbey shot him.

In *State v. Hodges,* 239 Kan. 63, 716 P.2d 563 (1986), on the night of the shooting, the husband attacked Hodges and beat her head against a doorjamb twenty times. He then said he was going to kill her. Hodges was then kicked and beaten before making her way into another room. When her husband said, "God damn you. Get in here now!" she grabbed a gun, ran to the doorway, and shot him.

On appeal, none of these cases raised the issue of the propriety of the self-defense instruction. Each case involved a threat of death to the wife and a violent confrontation between husband and wife, contemporaneous with the shooting. Here, however, there is an absence of imminent danger to defendant: Peggy told a nurse at the Oklahoma hospital of her desire to kill Mike. She later voluntarily agreed to return home with Mike when he telephoned her. She stated that after leaving the hospital Mike threatened to kill her if she left him again. Peggy showed no inclination to leave. In fact, immediately after the shooting, Peggy told the police that she was upset because she thought Mike would leave her. Prior to the shooting, Peggy hid the loaded gun. The cars were in the driveway and Peggy had access to the car keys. After being abused, Peggy went to bed with Mike at 8 p.m. Peggy lay there for two hours, then retrieved the gun from where she had hidden it and shot Mike while he slept.

Under these facts, the giving of the self-defense instruction was erroneous. Under such circumstances, a battered woman

cannot reasonably fear imminent life-threatening danger from her sleeping spouse. We note that other courts have held that the sole fact that the victim was asleep does not preclude a self-defense instruction. In *State v. Norman*, 89 N.C. App. 384, 366 S.E.2d 586 (1988), cited by defendant, the defendant's evidence disclosed a long history of abuse. Each time defendant attempted to escape, her husband found and beat her. On the day of the shooting, the husband beat defendant continually throughout the day, and threatened either to cut her throat, kill her, or cut off her breast. In the afternoon, defendant shot her husband while he napped. The North Carolina Court of Appeals held it was reversible error to fail to instruct on self-defense. The court found that, although decedent was napping at the time defendant shot him, defendant's unlawful act was closely related in time to an assault and threat of death by decedent against defendant and that the decedent's nap was "but a momentary hiatus in a continuous reign of terror." 89 N.C. App. at 394.

There is no doubt that the North Carolina court determined that the sleeping husband was an evil man who deserved the justice he received from his battered wife. Here, similar comparable and compelling facts exist. But, as one court has stated: "To permit capital punishment to be imposed upon the subjective conclusion of the [abused] individual that prior acts and conduct of the deceased justified the killing would amount to a leap into the abyss of anarchy." *Jahnke v. State*, 682 P.2d 991, 997 (Wyo. 1984). Finally, our legislature has not provided for capital punishment for even the most heinous crimes. We must, therefore, hold that when a battered woman kills her sleeping spouse when there is no imminent danger, the killing is not reasonably necessary and a self-defense instruction may not be given. To hold otherwise in this case would in effect allow the execution of the abuser for past or future acts and conduct.

One additional issue must be addressed. In its *amicus curiae* brief, the Kansas County and District Attorney Association contends the instruction given by the trial court improperly modified the law of self-defense to be more generous to one suffering from the battered woman syndrome than to any other defendant relying on self-defense. We agree and believe it is necessary to clarify certain portions of our opinion in *State v. Hodges*, 239 Kan. 63.

Here, the trial judge gave the instruction approved in *State v. Simon,* 231 Kan. 572, 575, 646 P.2d 1119 (1982), stating:

"The defendant has claimed her conduct was justified as self-defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of the defendant and the existence of facts that would persuade a reasonable person to that belief."

The trial judge then added the following::

"You must determine, from the viewpoint of the defendant's mental state, whether the defendant's belief in the need to defend herself was reasonable in light of her subjective impressions and the facts and circumstances known to her."

This addition was apparently encouraged by the following language in *State v. Hodges,* 239 Kan. 63, Syl. ¶ 4:

"Where the battered woman syndrome is an issue in the case, the standard for reasonableness concerning an accused's belief in asserting self-defense is not an objective, but a subjective standard. The jury must determine, from the viewpoint of defendant's mental state, whether defendant's belief in the need to defend herself was reasonable."

The statement that the reasonableness of defendant's belief in asserting self-defense should be measured from the defendant's own individual subjective viewpoint conflicts with prior law. Our test for self-defense is a two-pronged one. We first use a subjective standard to determine whether the defendant sincerely and honestly believed it necessary to kill in order to defend. We then use an objective standard to determine whether defendant's belief was reasonable—specifically, whether a reasonable person in defendant's circumstances would have perceived self-defense as necessary. See *State v. Simon,* 231 Kan. at 573-74. In *State v. Hundley,* 236 Kan. at 467, we stated that, in cases involving battered spouses, "[t]he objective test is how a reasonably prudent battered wife would perceive [the aggressor's] demeanor."

*Hundley* makes clear that it was error for the trial court to instruct the jury to employ solely a subjective test in determining the reasonableness of defendant's actions. Insofar as the above-quoted language in *State v. Hodges* can be read to sanction a subjective test, this language is disapproved.

The appeal is sustained.

PRAGER, C.J., dissenting.

HERD, J., dissenting: The sole issue before us on the question reserved is whether the trial court erred in giving a jury instruction on self-defense. We have a well-established rule that a defendant is entitled to a self-defense instruction if there is any evidence to support it, even though the evidence consists solely of the defendant's testimony. *State v. Hill*, 242 Kan. 68, 78, 744 P.2d 1228 (1987). It is for the jury to determine the sincerity of the defendant's belief she needed to act in self-defense, and the reasonableness of that belief in light of all the circumstances.

It is not within the scope of appellate review to weigh the evidence. An appellate court's function is to merely examine the record and determine if there is *any* evidence to support the theory of self-defense. If the record discloses any competent evidence upon which self-defense could be based, then the instruction must be given. In judging the evidence for this purpose, all inferences should be resolved in favor of the defendant. *State v. Hill*, 242 Kan. at 79.

To illustrate our adherence to these rules, a discussion of cases in which self-defense was claimed is in order. In *Hill*, we held the trial court erred in refusing to instruct on self-defense although the only evidence supporting defendant's theory was testimony that the deceased, a stranger to the defendant, pushed and hit the defendant in a crowded entrance hall and then raised her hand with an unknown object in it.

In *State v. Simon*, 231 Kan. 572, 646 P.2d 1119 (1982), the defendant assumed the victim, who was of Oriental extraction, was proficient in the martial arts. The two had previously had a verbal argument, and the defendant testified he was afraid of the victim. He testified the victim had walked toward him, cursing, on the day of the shooting, but the defendant did not shoot him then. Instead, he waited until the victim innocently tried to enter his own duplex. We disapproved the giving of PIK Crim. 2d 54.17 as not containing an objective standard of whether the facts were such as would persuade a reasonable person self-defense was necessary. We did not, however, conclude that no self-defense instruction should have been given; instead, we formulated a self-defense instruction which properly instructed on the law. 231 Kan. at 575.

In *State v. Kelly*, 131 Kan. 357, 291 Pac. 945 (1930), the

defendant sought out his wife's unarmed lover, shot him, and told his neighbor he did it "because of family trouble." At trial, however, the defendant said the victim gave him "a mean look" and withdrew his hand from his pocket; defendant then shot him from over 15 feet away. We noted that, because "self-defense was woven into" the defendant's testimony and a self-defense instruction was requested, the trial court was required to give it. 131 Kan. at 359-61.

In *State v. Childers*, 222 Kan. 32, 563 P.2d 999 (1977), we noted the failure to give a self-defense instruction when warranted by the evidence is reversible error, even when the defendant fails to request the instruction. We held there was not reversible error in *Childers*, however, because, although the defendant testified he shot the victim because he "didn't know what [the victim] had in his hands," he gave no testimony which would support a reasonable belief he was in danger. We noted the defendant testified he had never had trouble with the deceased before, and that the deceased had not threatened him. 222 Kan. at 35, 49.

It is evident from prior case law appellee met her burden of showing some competent evidence that she acted in self-defense, thus making her defense a jury question. She testified she acted in fear for her life, and Dr. Hutchinson corroborated this testimony. The evidence of Mike's past abuse, the escalation of violence, his threat of killing her should she attempt to leave him, and Dr. Hutchinson's testimony that appellee was indeed in a "lethal situation" more than met the minimal standard of "any evidence" to allow an instruction to be given to the jury. See *State v. Hill*, 242 Kan. at 78.

Appellee introduced much uncontroverted evidence of the violent nature of the deceased and how he had brutalized her throughout their married life. It is well settled in Kansas that when self-defense is asserted, evidence of the cruel and violent nature of the deceased toward the defendant is admissible. *State v. Hundley*, 236 Kan. 461, 464, 693 P.2d 475 (1985); *State v. Gray*, 179 Kan. 133, 292 P.2d 698 (1956). The evidence showed Mike had a "Dr. Jekyll and Mr. Hyde" personality. He was usually very friendly and ingratiating when non-family persons were around, but was belligerent and domineering to family members. He had a violent temper and would blow up without

reason. Mike was cruel to his two stepdaughters, Carla and Laura, as well as to the appellee. He took pride in hurting them or anything they held dear, such as their pets. Mike's violence toward appellee and her daughters caused appellee to have emotional problems with symptoms of paranoid schizophrenia. He would overdose appellee on her medication and then cut her off it altogether. Mike's cruelty would culminate in an outburst of violence, and then he would suddenly become very loving and considerate. This was very confusing to appellee. She lived in constant dread of the next outburst.

Appellee became progressively more passive and helpless during the marriage but finally became desperate enough to confront Mike and tell him the cruelty to her daughters had to stop. Mike responded by holding a shotgun to her head and threatening to kill her in front of the girls. The violence escalated. At one point, Mike kicked appellee so violently in the chest and ribs that she required hospitalization.

Mike threw twelve-year-old Carla out of the house without resources, and Laura left home as soon as she could. Mike would not let appellee see her daughters and ran Laura off with a shotgun when she tried to visit. Appellee's life became even more isolated. Towards the end, both the phone and utilities were disconnected from the house.

Appellee finally took the car and ran away to Laura's home in Oklahoma. It was the first time she had ever left Mike without telling him. She was suicidal and again hearing voices, and Laura had her admitted to a hospital. She was diagnosed as having toxic psychosis from a bad reaction to her medication. She soon felt better, but was not fully recovered, when Mike found out where she was and called her to say he was coming to get her. She told a nurse she felt like she wanted to shoot him, but the nurse noted her major emotion was one of hopelessness.

The hospital nevertheless released appellee to Mike's care, and he immediately drove her back to Kansas, telling her on the way she was going to have to "settle down now" and listen to him because he was the boss. *He said if she ever ran away again, he would kill her.*

When they reached the house, Mike would not let appellee bring in her suitcases and forced her to have oral sex four or five times in the next 36 hours, with such violence that the inside of

her mouth was bruised. The next morning, appellee found a box of bullets in the car that had not been there before. She then discovered a loaded .357 magnum. This frightened her, because Mike had promised to keep his guns unloaded. She did not know how to unload the gun, so she hid it under the mattress of the bed in a spare room. As she cleaned house, Mike remarked she should not bother, because she would not be there long. He told her she should not bother with her things, because she could not take them with her. She took these statements to mean she would soon be dead and she grew progressively more terrified. Throughout the day Mike continued to force her to have oral sex, while telling her how he preferred sex with other women.

The sexual abuse stopped when Mike's parents came to visit. Mike's father testified everything seemed normal during their stay. After the visit, Mike again forced appellee to perform oral sex and then demanded at 8:00 p.m. she come to bed with him. The cumulative effect of Mike's past history, coupled with his current abusive conduct, justified appellee's belief that a violent explosion was imminent. As he slept, appellee was terrified and thought about suicide and heard voices in her head repeating over and over, "kill or be killed." The voices warned her there was going to be killing and to get away.

She went to the spare bedroom and removed the gun from under the mattress, walked back to the bedroom, and fatally shot Mike. After the first shot, she thought he was coming after her so she shot again and fled wildly outside, barefoot, wearing only her underwear. Ignoring the truck and car outside, although she had the keys in her purse inside, she ran over a mile to the neighbors' house and pled with them to keep Mike from killing her. She thought she had heard him chasing her. The neighbor woman took the gun from appellee's hand and gave her a robe while her husband called the sheriff. The neighbor testified appellee appeared frightened for her life and was certain Mike was alive and looking for her.

Psychologist Marilyn Hutchinson qualified as an expert on the battered woman syndrome and analyzed the uncontroverted facts for the jury. She concluded appellee was a victim of the syndrome and reasonably believed she was in imminent danger. In *State v. Hodges,* 239 Kan. 63, Syl. ¶ 3, 716 P.2d 563 (1986), we held it appropriate to permit expert testimony on the battered

woman syndrome to prove the reasonableness of the defendant's belief she was in imminent danger. Most courts which have addressed the issue are in accord. See, *e.g., Hawthorne v. State,* 408 So. 2d 801 (Fla. Dist. App.), *rev. denied* 415 So. 2d 1361 (Fla. 1982); *Com. v. Rose,* 725 S.W.2d 588 (Ky. 1987); *State v. Anaya,* 438 A.2d 892 (Me. 1981); *State v. Gallegos,* 104 N.M. 247, 719 P.2d 1268 (N.M. App. 1986); *People v. Torres,* 128 Misc. 2d 129, 488 N.Y.S.2d 358 (1985); *State v. Leidholm,* 334 N.W.2d 811 (N.D. 1983); *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983); *State v. Kelly,* 102 Wash. 2d 188, 685 P.2d 564 (1984); *State v. Allery,* 101 Wash. 2d 591, 682 P.2d 312 (1984); and Annot., 18 A.L.R.4th 1153.

The majority implies its decision is necessary to keep the battered woman syndrome from operating as a defense in and of itself. It has always been clear the syndrome is not a defense itself. Evidence of the syndrome is admissible only because of its relevance to the issue of self-defense. See Rodwan, *The Defense of Those Who Defend Themselves,* 65 Mich. B.J. 64 (1986). The majority of jurisdictions have held it beyond the ordinary jury's understanding why a battered woman may feel she cannot escape, and have held evidence of the battered woman syndrome proper to explain it. See, *e.g., Hawthorne v. State,* 408 So. 2d 801; *State v. Anaya,* 438 A.2d 892; *State v. Baker,* 120 N.H. 773, 424 A.2d 171 (1980); *State v. Dozier,* 163 W. Va. 192, 255 S.E.2d 552 (1979). The expert testimony explains how people react to circumstances in which the average juror has not been involved. It assists the jury in evaluating the sincerity of the defendant's belief she was in imminent danger requiring self-defense and whether she was in fact in imminent danger.

Dr. Hutchinson explained to the jury at appellee's trial the "cycle of violence" which induces a state of "learned helplessness" and keeps a battered woman in the relationship. She testified appellee was caught in a such a cycle. The cycle begins with an initial building of tension and violence, culminates in an explosion, and ends with a "honeymoon." The woman becomes conditioned to trying to make it through one more violent explosion with its battering in order to be rewarded by the "honeymoon phase," with its expressions of remorse and eternal love and the standard promise of "never again." After all promises are broken time after time and she is beaten again and again, the

battered woman falls into a state of learned helplessness where she gives up trying to extract herself from the cycle of violence. She learns fighting back only delays the honeymoon and escalates the violence. If she tries to leave the relationship, she is located and returned and the violence increases. She is a captive. She begins to believe her husband is omnipotent, and resistance will be futile at best. See 65 Mich. B.J. at 66-67.

It is a jury question to determine if the battered woman who kills her husband as he sleeps fears he will find and kill her if she leaves, as is usually claimed. Under such circumstances the battered woman is not under actual physical attack when she kills but such attack is imminent, and as a result she believes her life is in imminent danger. She may kill during the tension-building stage when the abuse is apparently not as severe as it sometimes has been, but nevertheless has escalated so that she is afraid the acute stage to come will be fatal to her. She only acts on such fear if she has some survival instinct remaining after the husband-induced "learned helplessness." See generally Buda and Butler, *The Battered Wife Syndrome: A Backdoor Assault on Domestic Violence*, 23 J. Fam. L. 359 (1984-85).

Dr. Hutchinson testified the typical batterer has a dichotomous personality, in which he only shows his violent side to his wife or his family. A batterer's major characteristic is the need to blame all frustration on someone else. In a typical battering relationship, she said, the husband and wife are in traditional sex roles, the wife has low self-esteem, and the husband abuses drugs or alcohol. The husband believes the wife is his property and what he does to her is no one's business. There is usually a sense of isolation, with the woman not allowed to speak with friends or children. Overlying the violence is the intimation of death, often created by threats with weapons.

It was Dr. Hutchinson's opinion Mike was planning to escalate his violence in retaliation against appellee for running away. She testified that Mike's threats against appellee's life, his brutal sexual acts, and appellee's discovery of the loaded gun were all indicators to appellee the violence had escalated and she was in danger. Dr. Hutchinson believed appellee had a repressed knowledge she was in what was really a gravely lethal situation. She testified appellee was convinced she must "kill or be killed." For a discussion of the objective validity of appellee's

belief, see, *e.g.*, 18 Crim. Just. Newsletter No. 15, p. 6 (Aug. 3, 1987).

The majority claims permitting a jury to consider self-defense under these facts would permit anarchy. This underestimates the jury's ability to recognize an invalid claim of self-defense. Although this is a case of first impression where an appeal by the State has been allowed, there have been several similar cases in which the defendant appealed on other grounds. In each of these cases where a battered woman killed the sleeping batterer, a self-defense instruction has been given when requested by the defendant. See, *e.g.*, *People v. Emick*, 103 App. Div. 2d 643, 481 N.Y.S.2d 552 (1984); *People v. Powell*, 102 Misc. 2d 775, 424 N.Y.S.2d 626, *aff'd* 83 App. Div. 2d 719, 442 N.Y.S.2d 645 (1981); *State v. Leidholm*, 334 N.W.2d 811.

The most recent case on this issue is *State v. Norman*, 89 N.C. App. 384, 393, 366 S.E.2d 586 (1988), which held the trial court erred in refusing to instruct on self-defense where a battered wife shot her husband as he slept. The court stated:

"[W]ith the battered spouse there can be, under certain circumstances, an unlawful killing of a passive victim that does not preclude the defense of perfect self-defense. Given the characteristics of battered spouse syndrome, we do not believe that a battered person must wait until a deadly attack occurs or that the victim must in all cases be actually attacking or threatening to attack at the very moment defendant commits the unlawful act for the battered person to act in self-defense. Such a standard, in our view, would ignore the realities of the condition. This position is in accord with other jurisdictions that have addressed the issue."

There are other cases in which the defendant has been held to have the right to a jury instruction on self-defense where the victim, although not sleeping, was not directly attacking the defendant.

In *People v. Scott*, 97 Ill. App. 3d 899, 424 N.E.2d 70 (1981), the victim tapped his wrist as he was talking on the telephone as a signal to his battered companion that she was to bring handcuffs to him, which he often used on her before beating her. She instead got a gun and shot him. She testified at trial she was afraid the beating might kill her. The court held it was error for the trial court to refuse to instruct on self-defense.

In *State v. Allery*, 101 Wash. 2d 591, the battering husband broke into the couple's house despite a restraining order issued against him after initiation of divorce proceedings by the de-

fendant, who had suffered a consistent pattern of physical abuse at the hands of her husband during the marriage. The defendant found him lying on the couch waiting for her to come home. When he told her, "I guess I'm just going to have to kill you," she shot him before he moved. The court ruled the trial court's self-defense instruction was incomplete in failing to instruct that the defendant's claim of self-defense should be evaluated in light of all circumstances known to her.

In *State v. Gallegos*, 104 N.M. 247, the battering ex-husband had sexually abused his ex-wife and physically abused their son hours before he angrily called her into the bedroom. She testified she did not know whether he meant to rape, beat, or kill her. She picked up his loaded rifle and shot him. The appellate court found it was error for the trial court to refuse to give the defendant's proposed self-defense instruction, stating: "To require the battered person to await a blatant, deadly assault before she can act in defense of herself would not only ignore unpleasant reality, but would amount to sentencing her to 'murder by installment.'" 104 N.M. at 250. See discussion in Eber, *The Battered Wife's Dilemma: To Kill Or To Be Killed*, 32 Hastings L.J. 895, 928 (1981).

The majority bases its opinion on its conclusion appellee was not in imminent danger, usurping the right of the jury to make that determination of fact. The majority believes a person could not be in imminent danger from an aggressor merely because the aggressor dropped off to sleep. This is a fallacious conclusion. For instance, picture a hostage situation where the armed guard inadvertently drops off to sleep and the hostage grabs his gun and shoots him. The majority opinion would preclude the use of self-defense in such a case.

The majority attempts to buttress its conclusion appellee was not in imminent danger by citing 19th Century law. The old requirement of "immediate" danger is not in accord with our statute on self-defense, K.S.A. 21-3211, and has been emphatically overruled by case law. Yet this standard permeates the majority's reasoning. A review of the law in this state on the requirement of imminent rather than immediate danger to justify self-defense is therefore required. I will limit my discussion to those cases involving battered wives.

The first case, *State v. Hundley*, 236 Kan. 461, 693 P.2d 475

(1985), involved a battered wife who shot her husband when he threatened her and reached for a beer bottle. Hundley pled self-defense. We held it was error for the trial court to instruct that self-defense was justified if a defendant reasonably believed his conduct was necessary to defend himself against an aggressor's *immediate* use of force. We held this instruction improperly excluded from the jury's consideration the effect that Hundley's many years as a battered wife had upon her perception of the dangerousness of her husband's actions. We held the statutory word "imminent" should be used, rather than "immediate." See K.S.A. 21-3211.

The next case in which a battered wife claimed self-defense was *State v. Osbey*, 238 Kan. 280, 710 P.2d 676 (1985). The husband had a gun and had threatened to kill Osbey. After an argument while the husband was moving out, Osbey threw a chair towards his van. She shot him when he walked towards her and reached behind some record albums he was carrying. We again held the trial court erred in using the word "immediate" rather than "imminent" in the self-defense instruction to the jury.

In the most recent case, *State v. Hodges*, 239 Kan. 63, 716 P.2d 563 (1986), the battered wife was kicked and beaten before making her way into another room. When her husband ordered her to return to him, she shot him. When her first trial resulted in a hung jury, she was retried and convicted of voluntary manslaughter. K.S.A. 21-3403.

On appeal, we again held the trial court's use of "immediate" in instructing the jury on self-defense was reversible error. Such usage "places undue emphasis on the decedent's immediate conduct and obliterates the build-up of terror and fear the decedent systematically injected into the relationship over a long period of time." 239 Kan. at 74. We also held the trial court erred in not permitting expert testimony on the battered woman syndrome. We found it appropriate that the testimony be offered to prove the reasonableness of the defendant's belief she was in imminent danger.

Upon remand, the trial court refused to allow Dr. Modlin to testify for the State as an expert witness regarding evidence against the existence of the battered woman syndrome. The jury was again unable to reach a verdict, a mistrial was ordered, and

the court granted the defense's motion for acquittal pursuant to K.S.A. 22-3419.

The State appealed on questions reserved, and we held the trial court erred in excluding expert testimony, based on accepted methodology, *against* the battered woman syndrome. We found the jury may properly decide how much weight each side's expert testimony should receive. *State v. Hodges,* 241 Kan. 183, 734 P.2d 1161 (1987).

This ruling was in accord with our longstanding policy in this state of letting the defendant present his or her defense where supported by the slightest evidence, even if consisting only of the defendant's own testimony, and in giving the jury that expert testimony on either side which assists it in understanding the circumstances of the crime. We then trust the jury to weigh the evidence and apply the law to reach the proper verdict.

The majority disapproves *State v. Hodges,* 239 Kan. 63, where we adopted the subjective test for self-defense in battered wife cases. We adopted the subjective test because there is a contradiction in the terms "reasonably prudent battered wife." One battered into "learned helplessness" cannot be characterized as reasonably prudent. Hence, the *Hodges* modification of *State v. Hundley,* 236 Kan. 461, was necessary and properly states the law.

In *State v. Hundley,* we joined other enlightened jurisdictions in recognizing that the jury in homicide cases where a battered woman ultimately kills her batterer is entitled to all the facts about the battering relationship in rendering its verdict. The jury also needs to know about the nature of the cumulative terror under which a battered woman exists and that a batterer's threats and brutality can make life-threatening danger imminent to the victim of that brutality even though, at the moment, the batterer is passive. Where a person believes she must kill or be killed, and there is the slightest basis in fact for this belief, it is a question for the jury as to whether the danger was imminent. I confess I am an advocate for the constitutional principle that in a criminal prosecution determination of the facts is a function of the jury, not the appellate court.

I would deny this appeal.