**Xi Van HA, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4818.**

Court of Appeals of Alaska.

March 31, 1995.

David B. Koch, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

James L. Hanley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Xi Van Ha[1] appeals his conviction for second-degree murder, AS 11.41.110(a)(1). As explained in more detail below, the superior court refused to allow Ha to argue self-defense to the jury. The court allowed Ha to argue heat of passion to the jury, but the court instructed the jurors that they should evaluate the extent of the victim's provocation and the extent of Ha's opportunity to

---

1. In a Vietnamese name, the first name is the family name. Thus, the appellant's family name is "Xi". However, in all of the court documents in this case, Xi Van Ha is referred to as Mr. Ha. To avoid confusion, we will continue to refer to him in this manner.

calm himself from the point of view of a "mentally healthy" person. On appeal, Ha contends that the superior court should have instructed the jury on self-defense, and he contends that the court should have allowed the jury to consider evidence of Ha's mental abnormality when they assessed his heat of passion defense. We conclude that the superior court correctly resolved these issues, and thus we affirm Ha's conviction.

Ha came to the United States from Vietnam in 1980. He lived in California for ten years and then, in 1990, he moved to Dillingham, where he worked as a fisherman, a trade he had pursued both in his native country and in Malaysia. Despite his years in the United States, Ha's English remained rudimentary.

On June 7, 1991, Ha was employed to fish aboard the F/V (fishing vessel) Ultimate. After work on June 7th, Ha and his long-time friend Tran Gioi were socializing in the Willow Tree Bar in Dillingham. Later that evening they were joined by other Vietnamese fishermen. Among the new arrivals were Ly Van Hop and Buu Van Truong. Ha knew Buu and his family from the Vietnamese community in California, and he was also aware that Buu and Ly were roommates in Dillingham.

The men shared drinks in the Willow Tree; Ha later testified that he thought Buu was drunk by the time they left the bar. Ha, Tran, Ly, and Buu returned together to the Ultimate after Ha volunteered to reheat some leftover food. Ha later testified that his invitation to cook food was directed only to Tran and Ly. Ha did not wish to socialize with Buu because Buu was known as a violent person. According to Ha, Buu's family in California had a reputation for violence; Ha testified that, in California, Buu and his brothers (as well as other family members) had been known to threaten and beat people who crossed them. Knowing that Buu had been drinking, Ha suspected that Buu would be even more prone to violence.

The four men reached the boat and went aboard; Ha started the generator to heat the stove. While they waited for the stove to heat up, Ha's friend Tran lay down on a bunk, while Buu's friend Ly went out on deck. After about fifteen minutes, Buu began to get impatient that the food was not yet heated. He began to harass Ha, swearing at Ha and making comments such as "fuck your mother". Ha started swearing at Buu and told him to get off the boat. In response, Buu began to beat Ha. Ly ran in from the deck to assist Buu. Ly held Ha's arms to his side while Buu continued to beat him. Buu seized Ha by the hair and struck his face and head repeatedly with his fists.

As the beating continued, Ha began shouting for help. He yelled to his friend Tran, "Gioi, come out and ... fight: Buu is hitting me and killing me!" At one point, Ha yelled, "I'm dying!" When Tran heard Ha's cries for help, he rose from his bunk and came to Ha's aid. Tran physically separated Buu from Ha, but Buu was able to strike Ha four or five more times before he was pulled away. Ha testified that, at times during the beating, Buu hit him so hard that he fell down. Ha also testified that the attack left him with blurred vision.

Buu and Ly left the Ultimate, but they returned a few minutes later. This time, Buu was armed with a hammer. Buu came at Ha, screaming, "I'm going to kill you, and I will strike you until you die!" Buu swung the hammer at Ha's head, but Ha jumped from the Ultimate to the F/V Misty, which was berthed alongside. When Buu followed Ha onto the Misty, Ha ran into the cabin and held the door closed. Buu stood outside the cabin and, through the glass in the door, he shouted, "Fuck your mother! I will strike you and I will kill you!"

Buu continued his tirade for four or five minutes until Ha's friend Tran ran aboard the Misty and grabbed the hammer from Buu's hand. Ly came aboard too and escorted Buu away. Ha remained on the Misty for several minutes before returning to the Ultimate.

That night, Ha could not sleep. He feared that Buu was bound to return and kill him as he had promised. Tran attempted to reassure Ha, but Ha remained awake after his friend fell asleep. Ha's head was throbbing in pain. He paced throughout the boat.

As he paced, Ha remembered that there was a rifle aboard the Misty; Ha had previously used this weapon to shoot at birds while he was fishing. Ha went back to the Misty, retrieved the weapon, and loaded it.

Ha later testified that he was "very frightened". He lay awake on his bunk throughout the night, with the rifle at his side, "the voice of Mr. Buu ... resounding in [his] ears". Tran awoke and left the boat around 7:00 or 8:00 the next morning. Ha continued to lie awake on his bunk, thinking about Buu, the rifle still underneath his blanket. Several hours later (around 8:00 in the morning), Victor Sifsof, the owner of the boat, came aboard.

Ha was still lying on his bunk when Sifsof arrived. Sifsof spoke to Ha about mending nets that day, but Ha's head was still giving him great pain. Ha told Sifsof about the beating he had received from Buu and Ly the night before—that his head still hurt and his vision was still blurred. Sifsof saw that Ha was still very upset, even though he was acting sluggish. Ha told Sifsof that the two men who had attacked him worked on a boat owned by Billy Johnson, another local fisherman. Sifsof told Ha that he would speak to Johnson about his employees.

Around 10:00 that morning, Ha and Sifsof moved the Ultimate to a different location in preparation for the upcoming fishing opening. While the men were working, Ha left the rifle in his bunk. The Ultimate's new location happened to be closer to Johnson's boat, the boat on which Buu worked. Sifsof then left Ha alone on the Ultimate. The pain in Ha's head grew worse, and Ha became more frightened, realizing that he was closer to Buu. In his head, Ha heard Buu's voice becoming stronger and stronger, and he became more and more frightened. He lay down to try to sleep, but he found he could not. Ha tried to think of someone who could help him, but he was unable to think of anyone who could. Ha testified that Buu's voice remained in his head; he stated, "I [did] not think that I should call the police to help me—[b]ecause [Buu's] voice was just so ferocious and it stayed in my ears."

Finally, Ha retrieved the rifle from his bunk, left the Ultimate, and went in search of Buu. He kept the rifle hidden underneath his jacket. Ha later testified, "[M]y head was controlling my actions, and it was commanding me to go kill [Buu]."

Shortly after noon, Ha went to where he believed Buu was working. When he discovered that Buu was not there, Ha sat down for a while to wait for him. Ha then loitered in the vicinity of Buu's boat, where he was observed by other Vietnamese fishermen, including Buu's friend Ly. Ly saw Ha carrying a long object concealed under his jacket. Although Ha apparently did not remember speaking to anyone at the boat, Ly testified that he approached Ha and spoke to him. After learning that Ha was searching for Buu, Ly begged Ha to go back home. Ha refused.

A little later, Ha encountered his friend Charlie Tran. Tran observed that Ha was trembling and pale. Tran asked what was wrong and Ha responded, with seeming difficulty, that Buu had assaulted him and threatened to kill him. When Tran asked Ha what he was carrying under his coat, Ha told him, "This is none of your business." Tran urged Ha to let the incident pass, but Ha replied, "How can I let it go? Last night he beat me up and told me he was going to kill me; he already threatened to kill me. If he doesn't kill me today, he'll kill me tomorrow."

At 1:30 in the afternoon, Ha spotted Buu returning from a grocery store, carrying a bag of groceries. With Buu's voice still speaking in his head, Ha pulled out his rifle and ran towards Buu from behind. Ha repeatedly shot Buu in the back, firing the rifle thirteen times until he had emptied the weapon of ammunition. Buu was struck by seven of these rounds; he died immediately.

At trial, Ha testified that, after shooting Buu, he simply turned around and went back to the Ultimate. In contrast, another witness to the shooting testified that Ha walked up to Buu's body, kicked dirt on it, and then, in English, swore at Buu and said to the corpse, "I told you I was going to kill you."

Upon his return to the Ultimate, Ha changed his shirt, replaced the rifle in his bed, and hid. The police arrived and searched the boat, but they did not find Ha.

Later, Ha heard Victor Sifsof's voice. Ha emerged, holding his head, and explained to Sifsof that he might have to go to jail. Sifsof advised Ha to obtain an interpreter and go to the police, but Ha was reluctant to do this. Eventually, the police returned to the boat, found Ha, and arrested him.

Ha was indicted and tried for first-degree murder. The jury was instructed on the lesser included offenses of second-degree murder and manslaughter (under a heat of passion theory). The jury ultimately acquitted Ha of first-degree murder but found him guilty of second-degree murder.

*Should the Trial Court Have Instructed the Jury on Self–Defense?*

From the beginning of trial, Ha argued that he had acted in self-defense. In the defense opening statement to the jury (which was delivered immediately after the prosecutor's opening statement), Ha's attorney described how Buu had attacked Ha and threatened him with death; the attorney then continued:

DEFENSE ATTORNEY: [V]iolence was not uncommon for Buu. You will hear about this man and his dark, brooding, combative nature.... And I invite your close scrutiny and attention as the evidence comes in regarding [Buu's] character, because you will come to understand and appreciate not only the dark, dangerous, deadly side of this man, but also the significance of his threats. For anyone who knew Buu did not take his threats lightly. A threat from Buu that he would kill you was as good, had as much weight, as a kiss on [the] cheek by a ... Mafia godfather. That's how deadly Buu's threats were.

....

From knowing Buu, [Ha] knew that there was no escape. You see, Buu comes from ... a family of thugs who have a reputation for violence and extortion. You will hear that.... [Ha knew that] he would have to deal with the family, or with Buu himself. Today, tomorrow, they would stalk him down.

At the close of the evidence, Ha submitted proposed instructions on self-defense, but Superior Court Judge Milton M. Souter questioned whether the evidence supported all the elements of self-defense. Specifically, Judge Souter questioned whether there was any evidence that Ha faced imminent harm when he shot Buu.

THE COURT: There's something missing from the [proposed] self-defense instructions that I've already read, and that is the requirement of imminency of harm coming from the aggressor.... [AS] 11.81.330 states, [in] part (a), [that] "a person may use ... force upon another when and to the extent that person reasonably believes it is necessary for self-defense against what the person reasonably believes to be the use of unlawful force by the other".... And [if] you look to [AS] 11.81.900[ (b) ], subpart [ (23) ], ... " 'force' means any bodily impact, restraint, or confinement, or the threat of imminent bodily impact, restraint, or confinement".... So it's clear to me [that] ... the definition of "force" ... includes the requirement of imminency of threat of use of force as part of the definition.... It's not included in any of these self-defense instructions that I've seen.

And I don't even know if self-defense is appropriate ... in this case, because I'm not aware of any evidence that shows any imminency of [harm].... Bearing in mind that the altercation ... between these two men took place a good twelve hours before the killing[,] given the fact that it's uncontradicted that the defendant stalked this man for over an hour before he killed him[, and] [g]iven the fact [that] there's absolutely no evidence that the victim approached the defendant in the hour or hour and a half before the shooting, there was no imminency here at all.... I don't see it. And I'm going to want to be hearing argument on that.

Ha's attorney responded:

DEFENSE ATTORNEY: I think "imminency" [is viewed through] the eyes of the person asserting justifiable force. Not whether ... an independent person such as the judge looking at the evidence would see ... imminency under the facts, but

whether in [the] defendant's mind he felt that he was in imminent danger. I think there's been overwhelming evidence ... that he was in imminent fear.

Ha's attorney then analogized Ha's case to cases involving the "battered woman syndrome". The defense attorney claimed that, in cases where battered women shot their husbands while they slept, courts had ruled that the trial juries should receive instructions on self-defense.[2] The defense attorney told Judge Souter:

DEFENSE ATTORNEY: [T]he fact that Buu was shot from behind is irrelevant, just like the fact that a husband is shot while he's asleep. I think what the court has to [ask], and what the jury has to [ask], is, did the defendant feel that he was in imminent fear for his own safety? That's the first prong of self-defense. And then, on the second prong, ... would a reasonable person under like circumstances, another person who was in the situation of the defendant, given [the defendant's] background, experience, and what have you—how would that person feel? ... The jury may find that [Ha] was in imminent fear, but they may find that the reasonable person would not have been.... [Nonetheless], I think we meet the "some evidence" test.... [This is] an issue for the jury to decide.

Despite the defense attorney's argument, Judge Souter ruled that he would not instruct the jury on self-defense. He found that there was not a "single shred of evidence [to indicate] any imminency of harm or threat of harm facing [the defendant] at the time that he stalked [the victim] for an hour to an hour and a half, and shot him in the back and killed him.... It's absolutely, abundantly clear to me that an essential element of the self-defense justification [is] totally missing in this case."

The next morning, Ha's attorney renewed his argument for self-defense. He pointed to the evidence tending to prove that Ha had been in fear for his life and that a reasonable person in Ha's position would also have been afraid. The defense attorney argued,

DEFENSE ATTORNEY: You'd have to [ask] how would another Vietnamese, knowing how Vietnamese behave, knowing how, when Vietnamese make a public threat, that they carry it out and that you should take those threats seriously, knowing that this person making the threat has a violent temper [and] usually carries out his [threats]. You've got to take all of those circumstances into consideration and then ask yourself, would another person under those circumstances act the same way?

However, Judge Souter again concluded that the evidence did not justify an instruction on self-defense.

THE COURT: The evidence in this case is absolutely devoid of any evidence that there was ... any threat of imminent harm from Mr. Buu to this defendant. The evidence is absolutely clear ... that this defendant, even according to his own testimony, stalked the victim, looking for him for better than an hour before he ... shot him in the back, gunned him down.... The victim was unarmed. Any threat of harm ... had been made twelve to thirteen hours earlier. This is the uncontradicted state of this record. To an objective third-party observer, that could not possibly amount to imminency of threat of harm.... [I]f somebody beats you up and threatens to hurt you some more, the next day you can stalk them down and kill them? That's not the law of this state[.]

Judge Souter then noted a second ground for denying the requested self-defense instruction: the evidence showed that Ha had been the aggressor during the afternoon encounter with Buu on June 8th. Because AS 11.81.330(a) declares that self-defense is not available to the aggressor in a conflict, Judge Souter ruled that Ha's uncontroverted status as the aggressor on June 8th was another reason for not giving self-defense instructions.[3]

---

2. As explained below, this is not an accurate characterization of the current law.

3. Because there was no renewal of conflict on the afternoon of June 8th (other than Ha's act of shooting Buu), a conclusion that Ha was the

■ In Alaska, all use of force in self-defense is governed by AS 11.81.330(a). If the force used in self-defense rises to the level of deadly force as defined in AS 11.81.900(b)(12), then a claim of self-defense must additionally satisfy the requirements of AS 11.81.335. Section 335(a) limits deadly force to situations in which (1) the force is justified under AS 11.81.330 and (2) the actor "reasonably believes [that] the use of deadly force is necessary for self defense against death, serious physical injury", or one of the serious felonies listed in the statute. Section 335(b) declares that, even when the use of deadly force would be justified under section 335(a), a person must still refrain from using deadly force "if the person knows that, with complete ... safety ..., the person can avoid the necessity of using deadly force by retreating".[4]

■ Under Alaska law, a trial judge's obligation to instruct the jury on self-defense arises only if there is some evidence tending to prove each element of the defense. AS 11.81.900(b)(15)(A). The rule was the same before the enactment of the present criminal code:

> It is well recognized that the burden is on the defendant to produce some evidence in support of a claim of self-defense before he will be entitled to a jury instruction. *Bangs v. State*, 608 P.2d 1, 5 (Alaska 1980); *Toomey v. State*, 581 P.2d 1124, 1126 (Alaska 1978); *Folger v. State*, 648 P.2d 111 (Alaska App.1982).

*Paul v. State*, 655 P.2d 772, 775 (Alaska App.1982). Nevertheless,

> The burden to produce some evidence of self-defense is not ... a heavy one; this standard is satisfied when self-defense has fairly been called into issue.... A jury question will be presented and [a self-defense] instruction required if the evidence, when viewed in the light most favorable to the accused, might arguably lead a juror to entertain a reasonable doubt as to the defendant's guilt.

*Paul*, 655 P.2d at 775.

While the "some evidence" test may not be exacting in terms of the amount of evidence needed, the defendant's evidence must address all the legal elements of self-defense.

> [T]he trial court must ... determine whether or not [the evidence, viewed in the light most favorable to the defendant,] is adequate to raise the self-defense issue and, if believed, would *under the legal tests applied to a claim of self-defense* permit a reasonable doubt as to guilt[.]

*State v. Millet*, 273 A.2d 504, 508 (Maine 1971) (quoted in *Paul*, 655 P.2d at 775 n. 4) (emphasis added).

In this case, Judge Souter ruled that Ha failed to meet the requirements of the general statute, AS 11.81.330, because there was no evidence that Ha faced imminent peril. On appeal, Ha claims that Judge Souter misconstrued the requirement of "imminency".

■ Both at common law and under modern statutes, a person claiming self-defense as a justification for assaulting someone else has to show, not only that he or she reasonably feared harm at the hands of the other person, but also that he or she reasonably feared that the threatened harm was imminent.

> Case law and legislation concerning self-defense require that the defendant reasonably believe his adversary's violence to be almost immediately forthcoming. Most of the modern codes require that the defendant reasonably perceive an "imminent" use of force, although other language making the same point is sometimes found.

Wayne R. LaFave and Austin W. Scott, *Substantive Criminal Law* (1986), § 5.7(d), "Im-

---

aggressor at that encounter is really a restatement of the conclusion that Ha faced no imminent danger. Ha's status as the aggressor would have been important if there had been evidence that, during the encounter on the afternoon of June 8th, Buu had said or done something that reasonably put Ha in fear of imminent bodily harm. If that had been the case, then it would have been important whether Ha had been the aggressor on that occasion. Under the facts of this case, however, imminency of harm is the real issue.

4. The statute makes exceptions for (1) people who are in their own homes and who do not initiate the conflict, and (2) police officers or private citizens assisting police officers in the performance of their duties.

minence of Attack", Vol. 1, pp. 655–56. *See also* Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* (3rd ed. 1982), Ch. 10, Sec. 4, "Self–Defense", p. 1114. ("The danger must be, or appear to be, pressing and urgent. A fear of danger at some future time is not sufficient.")

■ Alaska's self-defense statute, AS 11.81.330(a), does not specifically mention the requirement of imminency:

> A person may use . . . force upon another when and to the extent the person reasonably believes it is necessary for self defense against what the person reasonably believes to be the use of unlawful force by the other, unless
>
> . . . .
>
> (3) the person claiming the defense of justification was the initial aggressor.

*LaFave & Scott* cites this statute as one of the few "self-defense provisions in the modern codes [that] fail to address [the requirement of imminency] explicitly". LaFave and Scott, *Substantive Criminal Law,* § 5.7(d), Vol. 1, p. 656 n. 38. However, as Judge Souter correctly perceived, AS 11.81.330 can be silent on this point because the legislature placed the requirement of imminency in the statutory definition of "force" contained in AS 11.81.900(b)(23):

> "[F]orce" means any bodily impact, restraint, or confinement[,] or the threat of imminent bodily impact, restraint, or confinement[;] "force" includes deadly and non-deadly force[.]

The interrelationship of these statutes is explicitly noted in the legislative commentary to the self-defense statutes, AS 11.81.330–335: "Since force is defined to include the threat of imminent bodily impact, a person may defend himself from threats of imminent impact as well as actual impact." 1978 Senate Journal, Supp. No. 47 (June 12), p. 126.

Ha argues that the imminency of a defendant's peril must be judged from the standpoint of the defendant. Ha contends that a reasonable person in Ha's position—a person who had heard Buu threaten his life and who knew the vicious propensities of Buu and his criminal family—would reasonably fear that Buu or one of his relatives would inevitably come some day to carry out Buu's threat to kill Ha.

■ Viewing the evidence in the light most favorable to Ha, we agree that there was sufficient evidence that a reasonable person in Ha's position would have feared death or serious physical injury from Buu. Buu had threatened Ha with death. Buu was a violent man who nursed grudges and who was likely to carry out his threat someday. Moreover, the evidence suggested that Buu came from a violent, criminal clan, and that Buu's relatives might very well help Buu carry out the threat—or might carry it out themselves if Buu was unable. In sum, Ha produced evidence to justify the remarks his attorney made during the defense opening statement:

> DEFENSE ATTORNEY: A threat from Buu that he would kill you was as good, had as much weight, as a kiss on [the] cheek by a . . . Mafia godfather. That's how deadly Buu's threats were.
>
> . . . .
>
> From knowing Buu, [Ha] knew that there was no escape. . . . Buu comes from . . . a family of thugs who have a reputation for violence and extortion. . . . [Ha knew that] he would have to deal with the family, or with Buu himself. Today, tomorrow, they would stalk him down.

However, "inevitable" harm is not the same as "imminent" harm. Even though Ha may have reasonably feared that Buu (or one of Buu's relatives) would someday kill him, a reasonable fear of future harm does not authorize a person to hunt down and kill an enemy.

This court discussed the requirement of imminency in a footnote in *Paul;* the court noted that a trial judge is authorized to reject self-defense instructions

> where there is some evidence that the defendant acted to defend himself, but no evidence of imminent peril. An example of circumstances under which self-defense instructions might be denied based on lack of imminent peril may be found in "battered wife syndrome" homicides. Typically, these cases involve a battered wife who kills her husband in his sleep. Although in

such instances there is commonly ample evidence to support a finding that the killing was motivated by fear and that the fear was as real and as urgent at the time of the killing as it was when the husband was awake and actually capable of immediate physical abuse, cases have uniformly refused to apply self-defense to this category of crime. The basis of the refusal has been lack of an immediate threat of harm.

*Paul*, 655 P.2d at 778 n. 8.

A recent case illustrating this principle is *State v. Stewart*, 243 Kan. 639, 763 P.2d 572 (1988). The defendant in that case had been subjected to years of horrifying treatment by her husband. He had repeatedly sexually abused her, beaten her, and threatened to kill her. When she ran away, he found her and brought her back. One evening, as her husband slept, the defendant heard voices repeating the phrase, "Kill or be killed." Responding to these voices, and to "get this over with, this misery and this torment", she took a revolver and shot her husband to death. *Id.* 763 P.2d at 574–75.

The Kansas court held that, under these facts, the defendant had failed to establish the imminency of any threatened harm, and thus the trial judge should not have instructed the jury on self-defense.

> No one can attack and kill another because he may fear injury at some future time. The perceived imminent danger [must] occur ... during the time in which the defendant and the deceased were engaged in their final conflict.
>
>     . . . .
>
> Because of [a] prior history of abuse, and [because of] the difference in strength and size between the abused and the abuser, the accused in such cases may choose to defend during a momentary lull in the

abuse, rather than during [an active] conflict. . . . However, in order to warrant the giving of a self-defense instruction, the facts of the case must still show that the spouse was in imminent danger close to the time of the killing.

*Stewart*, 763 P.2d at 577 (citations omitted).

The Kansas court agreed that evidence of a prior history of abuse and evidence of a woman's knowledge of her husband's personal characteristics and propensity for violence was relevant to show that the husband's conduct on a particular occasion gave the woman reason to fear that another episode of abuse was about to commence. *Id.* 763 P.2d at 577. The court also agreed that the test for self-defense is whether a reasonable person in the defendant's position would have perceived defensive action as necessary. Specifically, "in cases involving battered spouses, the objective test is how a reasonably prudent battered wife would perceive the aggressor's demeanor". *Id.* 763 P.2d at 579. However, the court found Stewart's case to be distinguishable from other spousal abuse cases in which (1) the wife shot the husband during a contemporaneous violent confrontation, or in which (2) the husband's words or actions gave the wife good cause to believe that she was about to be attacked. *Id.* 763 P.2d at 577–79.

> We must, therefore, hold that when a battered woman kills her sleeping spouse when there is no imminent danger, the killing is not reasonably necessary and a self-defense instruction may not be given. To hold otherwise ... would in effect allow the execution of the abuser for past or future acts and conduct.

*Stewart*, 763 P.2d at 579.[5]

Turning from cases involving battered spouses and children, the case of *State v.*

---

5. *Accord, State v. Reid*, 155 Ariz. 399, 747 P.2d 560 (1987) (The defendant's father had subjected her to years of physical and sexual abuse. To prevent further abuse, the defendant shot and killed her father while he slept. Held: the defendant was not entitled to a self-defense instruction.); *Jahnke v. State*, 682 P.2d 991, 995–97, 1006–07 (Wyo.1984) (The defendant's father had mentally and physically abused him for years. The defendant lay in ambush for his father one night as the father returned home from a restaurant, then shot and killed him. Held: the defen-

dant was not entitled to a self-defense instruction because he had no reason to believe that he was in imminent danger.); *State v. Norman*, 324 N.C. 253, 378 S.E.2d 8, 13–16 (1989) (The defendant had suffered long-term abuse at the hands of her husband. Each time she attempted to escape, he found her and beat her. On the day of the shooting, the husband beat the defendant throughout the day and threatened to kill or mutilate her. In the afternoon, the defendant shot her husband while he was taking a nap.

*Buggs*, 167 Ariz. 333, 806 P.2d 1381 (App. 1990), illustrates the requirement of imminency under facts more analogous to Ha's case. Buggs was involved in a pool hall fight; he was kicked and stabbed by three men and a woman. One of Buggs's friends grabbed him and helped him to safety on the other side of the building. There, the friend handed Buggs a pistol and told him to "take care of himself". *Id.* 806 P.2d at 1383. Buggs returned to the front of the pool hall, found the woman and two of the men who had assaulted him, and began firing his pistol at them. He succeeded in wounding the woman. *Id.*

Buggs was charged with aggravated assault, and he claimed self-defense. He presented evidence that the men he had fought with were members of a street gang called the "Crips", and that these men and their fellow gang members would eventually find him and finish what they had begun:

> At various points in his testimony, the defendant elaborated on his fear of the Crips. When asked why he felt he was in danger when he returned to the [pool hall] parking lot, he said: "Because I know the Crips, I know what they do. You have to get them before they get you.... [S]ee, I've been on the streets a long time, I have seen how the Crips act, I know what they do, and they get you in a position where you don't [have] protection, [and] they will wipe you."

*Buggs*, 806 P.2d at 1383.

The Arizona court acknowledged that a defendant is entitled to a self-defense instruction "if there is the slightest evidence of justification for his act". *Id.* However, the court found no evidence that the defendant had been in danger of imminent harm from his enemies.

> [When] the defendant shot in the direction of the Crips, they were not advancing upon

or physically menacing him in any way. Characterized most strongly for the defendant, all that the evidence showed was that the defendant thought the two men he shot at were highly dangerous individuals who meant to do him harm, and who ... had to be eradicated right away to prevent them from gaining an advantage over him and injuring him at some later time. The question is, does this kind of threat justify the defendant's action? We believe it does not.

> ....

> We have not found any case that would allow a claim of self-defense under the circumstances presented here. While we agree that a victim's past acts and reputation for violence will often be relevant on the question of the reasonableness of a defendant's use of force in self-defense, ... one may resort to deadly force only if it is necessary to prevent immediate harm. The defendant's "self-defense" in this case was nothing more than a "preemptive strike" against the men he feared.

*Buggs*, 806 P.2d at 1384–85.

The Arizona court conceded that there might be times when the requirement of imminency should be relaxed. The court referred to an example described in *LaFave & Scott*, § 5.7(d), Vol. 1, p. 656, of a kidnapping victim who is informed that he will be killed at the end of the week and whose best opportunity to escape this fate is to kill his kidnapper early in the week. Under such circumstances, *LaFave* suggests, "[t]he proper inquiry is not the immediacy of the threat but the immediacy of the response necessary in defense. If a threatened harm is such that it cannot be avoided if the intended victim waits until the last moment, the principle of self-defense must permit him to act earlier—as early as is required to defend himself effectively". *Id.*

Held: the defendant was not entitled to self-defense instructions because there was no evidence that she reasonably believed that death or great bodily harm was imminent.); *Whipple v. State*, 523 N.E.2d 1363, 1365–67 (Ind.1988) (The seventeen-year-old defendant and his sister had suffered years of mental and physical abuse at the hands of their parents. The defendant retaliated by killing first his mother and then his

father with an axe. The defendant claimed that he had acted in self-defense because he and his sister "lived in an ongoing atmosphere of imminent danger of serious bodily harm and fear of death". Held: the defendant was not entitled to self-defense instructions because there was no evidence that the defendant reasonably believed that he or his sister faced imminent danger.).

However, the Arizona court found that the case in front of them was readily distinguishable from *LaFave*'s example:

Here, when the defendant returned to the area of the confrontation and fired his pistol at the men who had kicked him, he was not under their domination and control, and they gave no signal that they intended to renew their attack. Our conclusion is in line with settled authority to the effect that after a fight has broken off, one cannot pursue and kill merely because he once feared for his life.

*Buggs*, 806 P.2d at 1385 (citations omitted). The court therefore ruled that Buggs was not entitled to an instruction on self-defense. *Id.*

*State v. Hernandez*, 253 Kan. 705, 861 P.2d 814 (1993), is in accord with *Buggs*. In *Hernandez*, the defendant's sister was having marital problems and wanted to leave her husband. The sister's husband threatened her with violence if she left him or if she contacted the police. To support his sister, the defendant went to confront the husband. When the husband told the defendant to mind his own business, the defendant shot him. Charged with murder, Hernandez claimed that he acted in defense of another (his sister), because his brother-in-law would have killed or seriously injured the sister in the near future. The court held that defense of others was not available to the defendant because he had no reason to believe that his brother-in-law posed a threat of imminent harm to his sister. *Id.* 861 P.2d at 820.

Also in accord with *Buggs* is *State v. Mize*, 316 N.C. 48, 340 S.E.2d 439 (1986). A man named McDonald had spent the day looking for Mize because he believed that Mize had raped his girlfriend. All during that day, Mize hid. When night came, Mize went to McDonald's residence, woke him up, and shot him. Mize claimed that he had acted in self-defense because he reasonably believed that McDonald would eventually find him and try to kill him. The court answered:

Here, although the victim had pursued [the] defendant during the day approximately eight hours before the killing, defendant Mize was in no imminent danger when McDonald was at home asleep. When Mize went to McDonald's trailer with his shotgun, this was a new confrontation. Therefore, even if Mize believed it was necessary to kill McDonald to avoid his own imminent death, that belief was unreasonable.

*Mize*, 340 S.E.2d at 442 (citations omitted).

Consistent with the above authorities, and in accord with the wording of AS 11.81.330 and AS 11.81.900(b)(23), we hold that a defendant claiming self-defense as justification for the use of force must prove that he or she acted to avoid what he or she reasonably perceived to be a threat of *imminent* harm. A defendant's reasonable belief that harm will come at some future time is not sufficient to support a claim of self-defense or defense of others.

Ha's evidence supported the conclusion that he reasonably believed that Buu would someday harm him. But the requirement of imminency limits the scope of authorized self-defense. A defendant may actually and reasonably believe that, sooner or later, his enemy will choose an opportune moment to attack and kill him. Nevertheless, as Judge Souter noted, the law does not allow a defendant to seek out and kill his enemy so that he no longer has to live in fear. The defendant's use of force against his enemy is authorized only when the defendant actually and reasonably believes that the enemy's threatened attack is imminent. AS 11.81.900(b)(23); *Paul v. State*, 655 P.2d at 777, 778 n. 8.

Ha argues that, when determining whether a defendant reasonably believed that harm was imminent, the trial judge and the jury must consider the circumstances as they appeared to the defendant. Ha contends that, in his case, these circumstances include "[Ha's] past experiences, his knowledge of [Buu], as well as [Ha's] physical and mental condition". We agree with Ha up to a point.

■ A defendant's knowledge of the deceased's violent nature must be considered when judging the reasonableness of the defendant's actions and perceptions. *Byrd v. State*, 626 P.2d 1057, 1058 (Alaska 1980). And we agree with Ha that the reasonableness of his perception of imminent harm must be evaluated, not just based on Buu's

words and actions on the specific occasion when Ha killed him, but also based on Ha's knowledge of Buu's propensities and past conduct.

> [T]he determination of reasonableness must be based on the "circumstances" facing a defendant or his "situation"[.] Such terms encompass more than the physical movements of the potential assailant.... [T]hese terms include any relevant knowledge the defendant had about the person. They also necessarily bring in the physical attributes of all persons involved, including the defendant. Furthermore, the defendant's circumstances encompass any prior experiences he had which could provide a reasonable basis for a belief that another person's intentions were to injure [or commit a crime upon] him or that the use of deadly force was necessary under the circumstances.

*People v. Goetz,* 68 N.Y.2d 96, 506 N.Y.S.2d 18, 29, 497 N.E.2d 41, 52 (1986) (citations omitted).

Thus, Ha is correct when he asserts that the reasonableness of his belief that he faced imminent harm must be analyzed in light of the severe beating that Ha had sustained at Buu's hands twelve hours before, in light of Buu's earlier repeated threats to kill Ha, and in light of Ha's knowledge of Buu and his family, whose criminal history indicated that Buu's threats should be taken seriously. And, to the extent that an understanding of Vietnamese culture was relevant to evaluating Buu's motivation or readiness to kill Ha, this too was a proper matter to be considered.

However, Ha argues that, because of his cultural background and his poor command of English, he felt that it would be useless to go to the police for help and that he had "no viable alternatives" to killing Buu. The evidence at Ha's trial shows that Ha had ample opportunity to inform others of his conflict with Buu and to seek their assistance. During the twelve or thirteen hours between the fight on board the Ultimate and the shooting, Buu left Ha completely alone. During this period, Ha had conversations with the skipper of his fishing boat and with various acquaintances in the Vietnamese community.

Moreover, even assuming that Ha believed it would be pointless to speak with any of these people about Buu's threats, this does nothing to establish that Buu posed an imminent danger to Ha or that Ha could have reasonably believed that Buu posed such a danger. Ha's argument is simply another way of saying that Ha believed Buu would inevitably kill him if Ha did not act first. As we have said, a reasonable fear of future harm does not justify killing one's enemy.

■ Ha also appears to argue that Vietnamese culture teaches that all police are corrupt, that one can expect no help from the authorities, and that people must take the law into their own hands to resolve personal disputes. Assuming for purposes of argument that Ha's characterization of Vietnamese culture is accurate, and further assuming that Ha believed all these things, this still does not establish that Ha reasonably believed that Buu posed an imminent danger to him. To the extent that Ha might be arguing that the law of self-defense should make exceptions for people whose culture encourages vendettas, killings to assuage personal honor, or preemptive killings to forestall future harm, we reject Ha's argument.

■ Ha next contends that Judge Souter (and ultimately the jury) should have evaluated the imminency of harm from the point of view of someone who was not thinking clearly. Ha argues that, because of his extreme fear and because he had possibly sustained brain injury during Buu's earlier attack, he was subjectively convinced that Buu was about to kill him at any moment. Assuming this is true, this would not establish the reasonableness of Ha's subjective perception. (In fact, if Ha is arguing that he would not have perceived an imminent danger were it not for his mental abnormality, his argument establishes that he was acting *unreasonably.*)

When the law says that the reasonableness of self-defense must be evaluated from the point of view of the defendant, this does not mean from the point of view of a mentally ill defendant. The reasonableness of a defendant's perceptions and actions must be evaluated from the point of view of a reasonable person in the defendant's situation, not a

person suffering mental dysfunction. This distinction was elaborated in *People v. Goetz:*

> [The lower court concluded that] the appropriate test ... is whether a defendant's beliefs and reactions were "reasonable to *him*". Under that reading of the statute, a jury which believed a defendant's testimony that he felt that his own actions were warranted and were reasonable would have to acquit him, regardless of what anyone else in the defendant's situation might have concluded. Such an interpretation defies the ordinary meaning and significance of the term "reasonably" ... and misconstrues the clear intent of the Legislature[.]
>
> ....
>
> [There must] be a reasonable basis, viewed objectively, for the [defendant's] beliefs.... [A] belief based upon mere fear or fancy ... or a delusion pure and simple would not satisfy the requirements of the statute.
>
> ....
>
> To completely exonerate such an individual, no matter how aberrational or bizarre his thought patterns, would allow citizens to set their own standards for the permissible use of force. It would also allow a ... defendant suffering from delusions to kill or perform acts of violence with impunity, contrary to fundamental principles of justice and criminal law.

*Goetz*, 506 N.Y.S.2d at 25, 27–28, 497 N.E.2d at 47–48, 50 (emphasis in the original) (citations omitted). *See also Werner v. State*, 711 S.W.2d 639, 645 (Tex.Crim.App.1986) ("[A] 'reasonable belief' [in the necessity of self-defense] is one that would be held by an 'ordinary and prudent [person] in the same circumstances as the actor.' ... [T]he test [incorporates] the 'ordinary prudent man test of tort law.' ")

Thus, the reasonableness of Ha's belief in the imminence of danger must be evaluated from the point of view of a reasonable person in his situation—someone with Ha's pertinent knowledge of and experience with Buu, but someone whose perceptions were clear and rational. If the rule were otherwise, judges and juries would be obliged to acquit defendants who killed under a psychotic delusion that they were about to suffer serious harm.

In this case, despite the evidence suggesting that Ha had good reason to fear future harm from Buu, there was no evidence that Ha was in imminent danger, or could have reasonably believed himself to be in imminent danger, when he hunted Buu through the streets of Dillingham and then shot him from behind while Buu was carrying groceries. Judge Souter therefore correctly declined to instruct the jury on self-defense.

*Did the Trial Court Give a Proper Instruction on Heat of Passion?*

Although Judge Souter ruled that Ha could not argue self-defense to the jury, the judge allowed Ha to argue that his homicide should be mitigated to manslaughter under the doctrine of heat of passion. This doctrine is codified in AS 11.41.115(a):

> In a prosecution [for first-degree murder] under AS 11.41.100(a)(1)(A) or [for second-degree murder under] AS 11.41.110(a)(1), it is a defense that the defendant acted in [the] heat of passion, before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim.

The term "serious provocation" is defined in AS 11.41.115(f)(2) as:

> conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as the defendant reasonably believed them to be; insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not, alone or in combination with each other, constitute serious provocation.

This court has recognized that the "passion" spoken of in AS 11.41.115(a) encompasses more than rage—that it includes terror and other intense emotions. *LaPierre v. State*, 734 P.2d 997, 1001 (Alaska App.1987). Thus, if Ha killed Buu while in great fear for his life, this could qualify as "heat of passion" assuming the other statutory conditions were met.

However, it is not sufficient that the defendant experience heat of passion. Under AS 11.41.115(f)(2), the defendant's passion must be caused by "conduct ... sufficient to excite an intense passion in a reasonable person in the defendant's situation ... under the circumstances as the defendant reasonably believed them to be". Moreover, under AS 11.41.115(a), the defendant's use of force must occur "before there [was] a reasonable opportunity for the [defendant's] passion to cool".[6]

When the heat of passion jury instructions were argued at Ha's trial, the prosecutor proposed an instruction that would define "reasonable person" as a "reasonably healthy person whose thinking is not influenced by mental difficulties that skew or affect his ability to form reasonable thought processes or act in a reasonable fashion". The prosecutor further proposed that the jury be told that a "reasonable person" is someone "unaffected by cultural mores of foreign countries", and that the "reasonable person" standard incorporated "the cultural standards and legal rules of orderly conduct of the United States and the State of Alaska".

Ha's attorney took strong exception to the prosecutor's proposed instruction.

DEFENSE ATTORNEY: [A]s far as a normal, healthy person, ... the court has allowed testimony to come in regarding [the defendant's] state of mind. I think the court has to allow the jury to consider that. Particularly in light of the court's ruling that heat of passion comes in. So I ... disagree with [the] interpretation that a reasonable person is some normal American devoid of the circumstances we have here. And the circumstances include someone's cultural background, because [this] may go to mitigating the [killing].... [T]he circumstances in this particular case [include] my client's knowledge of the deceased, the deceased's background for violence, his history for violence, his

... cultural history of carrying out threats, and in that particular culture people would take him seriously. So I think it would be wrong for the court to [instruct the jury] that a reasonable person is ... some normal American farm boy from Iowa.

Judge Souter agreed with the defense attorney that Ha's cultural background and knowledge were relevant when assessing the reasonableness of his actions. For this reason, Judge Souter ruled that he would give only the first part of the prosecutor's proposed instruction. The instruction, in its final form, read:

When these instructions use the term "reasonable person" or "reasonably believe", they mean a reasonable, mentally healthy person whose thinking is not influenced by mental difficulties that skew or affect his ability to form reasonable thought processes or to act in a reasonable fashion.

Ha's attorney continued to object to the abridged instruction, but in a conclusory fashion:

DEFENSE ATTORNEY: [J]ust for clarification purposes, I take it this [instruction] is from one of the standard instructions?

PROSECUTOR: I wrote it last night.

THE COURT: I don't think it's standard at all.

. . . .

DEFENSE ATTORNEY: Precisely.

. . . .

THE COURT: [W]e could never make any progress in this world if we [always did] what has been done in the past.

DEFENSE ATTORNEY: I agree, Judge, but I don't think the instruction follows the law. I don't think it follows the law.

---

**6.** Heat of passion does not require that the act of killing be reasonable, for a reasonable killing is no crime. "What is really meant by 'reasonable provocation' is provocation which causes a reasonable [person] to lose his [or her] normal self-control; and although a reasonable [person] who has thus lost control ... would not kill, yet his [or her] homicidal reaction to the provocation is at least understandable." W. LaFave and A. Scott, *Substantive Criminal Law* (1986), § 7.10, Vol. 2, p. 256.

THE COURT: [T]his is an instance of giving an instruction specifically tailored to this case, and I believe it does state the law, so I shall give it over objection.

DEFENSE ATTORNEY: I disagree[.] [I]t doesn't follow the law, but I've made my record.

THE COURT: You've made your record.

On appeal, Ha argues that the jury instruction defining "reasonable person" was erroneous—that the reasonableness of his conduct should have been evaluated in light of his mental abnormality. In particular, Ha relies on the expert testimony presented at his trial which indicated that, because of Buu's attack the night before, Ha might have been suffering from "post-concussion syndrome", a mental condition brought on by head injury. According to this expert testimony, post-concussion syndrome causes the sufferer to have a lowered tolerance to stress and to be more susceptible to emotional instability. Ha argues that the reasonableness of his perceptions, reactions, and conduct should have been evaluated in light of this syndrome.

When the law tests the reasonableness of a defendant's actions, the issue is what a reasonable person would have done in the defendant's circumstances. As we indicated in our discussion of self-defense, a defendant's "circumstances" encompass the various aspects of a defendant's knowledge, experience, and physical situation. However, we agree with Judge Souter that the reasonableness of the defendant's conduct must not be evaluated by asking what a person suffering from mental abnormality would have thought or done.

Some cases have considered whether the law should take into account, in measuring the adequacy of the provocation, the fact that the defendant possesses some peculiar mental or physical characteristic, not possessed by the ordinary person, which caused him, in the particular case, to lose self-control. It is quite uniformly held that the defendant's special mental qualities—as where, because of sunstroke or head injury, he is particularly excitable—are not to be considered.

LaFave and Scott, *Substantive Criminal Law* (1986), § 7.10, Vol. 2, p. 262.

In *State v. Russo,* 69 Haw. 72, 734 P.2d 156 (1987), the defendant was charged with two counts of murder for shooting into a bar and killing two patrons. He defended on the basis that he had an insane belief that "these guys were going to kill me unless I killed them". *Id.* 734 P.2d at 160. Besides the defense of insanity, Russo also asked the trial judge to instruct the jury that his killings might be manslaughter under the Hawaii statute that mitigates a homicide committed "under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation". *Id.* 734 P.2d at 158. The trial judge rejected the proposed instruction, and the Hawaii Supreme Court affirmed:

The [common-law] rule that provocation could, within narrow bounds, reduce murder to manslaughter, represented a limited concession to human weakness. While [Hawaii's statute] relaxes the rigorous objectivity of the common-law doctrine, it still requires that the actor's emotional distress be based on "reasonable explanation or excuse". This key phrase preserves the essentially objective character of the inquiry and erects a barrier against debilitating individualization of the legal standard.

. . . .

Granted, [Russo] may have been mentally or emotionally disturbed; but nothing Russo offered . . . provided "a reasonable explanation or excuse" for his conduct under any test of reasonableness. . . . A ruling that evidence of this nature . . . furnishes a basis for mitigating the offense of murder to manslaughter would undermine the normative message of the criminal law[.]

*Russo,* 734 P.2d at 160 (citations omitted).

On appeal, Ha argues that his case should be viewed differently because there was at least some evidence that his mental abnormality stemmed from a head injury caused by Buu's earlier assault. This proposed distinction (between unreasonable behavior stemming from pre-existing mental dysfunction and unreasonable behavior stemming from mental dysfunction caused by the vic-

tim's prior assault on the defendant) was not argued in the trial court, and we do not find plain error. As noted above, the law has traditionally refused to consider a defendant's mental abnormality when deciding heat of passion claims, and Ha cites no heat of passion cases which have accepted his proposed rule of law.

### Conclusion

For the reasons explained above, we uphold Judge Souter's refusal to instruct the jury on self-defense, and we also uphold his decision to instruct the jury that Ha's mental abnormalities should not be considered when deciding Ha's claim of heat of passion.

The judgement of the superior court is AFFIRMED.

COATS, J., dissents.

COATS, Judge, dissenting.

In *Folger v. State*, 648 P.2d 111 (Alaska App.1982), we concluded that the trial judge erred in failing to give an instruction on self-defense. In that case, we stated:

> From his opening statement it appears that Folger's primary defense was self-defense. Although his defense was extremely weak, ·he did present evidence from which a reasonable juror could conclude that self-defense existed. It is obvious why a trial judge would be less than impressed with Folger's explanation for his use of a dangerous weapon. However, Folger was entitled to trial by jury and a jury should have been instructed on his self-defense claim.

*Id.* at 113–14 (footnote omitted). In a footnote we went on to say:

> We think a strong argument can be made that a trial judge should err on the side of giving instructions on self-defense so as to avoid a needless appellate issue in cases in which a weak case for self-defense is presented. We also think in a case such as this where self-defense is presented as a possible defense, there is a danger that the jury may consider its own understanding of what self-defense is in the absence of an instruction from the court. It seems pref-

> erable to have the jury correctly instructed.

*Id.* at 113–14 n. 3. In reaching this decision in *Folger,* we relied on decisions of the Alaska Supreme Court which we concluded required the trial judge to instruct on self-defense even where the evidence supporting the defendant's self-defense claim was weak or implausible. *Houston v. State,* 602 P.2d 784, 785 (Alaska 1979); *Toomey v. State,* 581 P.2d 1124, 1126 n. 6 (Alaska 1978). We have consistently adhered to this precedent. *See, e.g., Willett v. State,* 836 P.2d 955, 958 (Alaska App.1992); *Carson v. State,* 736 P.2d 356, 359 (Alaska App.1987). I see our decision in this case as a departure from that precedent and consequently dissent.

Ha's primary defense was self-defense. I agree that Ha's defense suffered severe problems because of the time that elapsed between Buu's assault and the moment when Ha shot Buu. There is little evidence that Ha had a need to defend himself from Buu at the time he shot Buu.

However, despite the problems with his defense, Ha was entitled to a jury trial, and it seems to me that it was Ha's right to have the jury decide his claim of self-defense based on proper instructions. Since Judge Souter did not instruct the jury on self-defense, this probably had the effect of taking Ha's defense from the jury. The jury either did not decide the issue of self-defense, or had to decide whether self-defense existed based upon their own understanding of the issue. Either result seems to me to be improper, and undermines Ha's right to a jury trial. I therefore conclude that Judge Souter erred in failing to instruct the jury on self-defense and that his action tended to deprive Ha of his right to a jury trial. I would reverse Ha's conviction.